John A. SMITH, Appellant,

v.

STATE of Indiana, Appellee.

No. 1279S345.

Supreme Court of Indiana.

April 22, 1981.

William T. Lawrence, Indianapolis, for appellant.

Theodore L. Sendak, Atty. Gen., Stephen J. Cuthbert, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant, John Smith, was convicted of murder, a class A felony, in a trial by jury before the Honorable Patricia J. Gifford, Judge of the Marion Superior Court, Criminal Division Four. He was charged with having knowingly killed Marvin C. Foster by stabbing him with a knife, such charge having been brought pursuant to Ind.Code § 35–42–1–1. Appellant received a determinate fifty year sentence. On appeal we consider the following contentions of appellant:

(1) that the verdict is not supported by sufficient evidence;

(2) that the trial court erred in admitting State's Exhibits Nos. 34, 35 and 36, envelopes containing scrapings;

(3) that a statement by appellant should have been suppressed;

(4) that the trial court erred in allowing testimony by a police officer explaining his reason for statements made to appellant; and

(5) that the trial court erred in refusing to permit introduction of a photograph tendered by appellant.

## I.

The claim is made that the evidence serving to identify appellant as the assailant of the victim and to prove that he harbored the intent to kill the victim was insufficient to support the jury verdict. In determining this question we do not weigh the evidence nor resolve questions of credibility but look to the evidence, direct and circumstantial, and reasonable inferences therefrom which support the verdict. *Smith v. State*, (1970) 254 Ind. 401, 260 N.E.2d 558. The conviction will be affirmed if from that viewpoint there is evidence of probative value from which a reasonable trier of fact could infer that appellant was guilty beyond a reasonable doubt. *Glover v. State*, (1970) 253 Ind. 536, 255 N.E.2d 657.

The evidence viewed from this standpoint showed that appellant, the decedent Marvin Foster, and the prime prosecution witness, Kalvyn Collins, were friends and for at least a year prior to Foster's death had spent a lot of time together. The mother of appellant and the mother of Collins worked together and visited one another's home. On August 17, 1978, Foster and Collins lived in a one room basement apartment along with Collins' infant daughter. Collins' mother Flora Ruffin lived upstairs in the same house, as did one Robert Ward. On the night of the 17th at 11:00 p. m. Ms. Ruffin came home from work and as was her custom looked in on her daughter. She saw that the three were already in bed asleep. Foster was on one side of the bed, Collins was on the other, and the baby was between them. Ms. Ruffin went on upstairs, and after dozing off, was awakened by her daughter screaming. She went out of her room and her daughter yelled frantically to her, "Momma, John has killed Marvin!"

At this point Ms. Ruffin saw the baby attempting to climb the stairs. She was covered with blood. Ms. Ruffin picked the baby up and continued to the basement where she saw Marvin Foster on the couch in the room bleeding. He held his hand out to Ms. Ruffin and said, "Momma, help me." Shortly, Mr. Ward, the roomer from upstairs then appeared and examined Foster's eyes and declared that he was dead.

The police were called, and arrived at the apartment at about 2:00 a. m. Collins was observed by them to be dressed in a blue night gown, with blood on her, and in a state of shock. There was a large amount of blood on the bed and in the doorway and on the couch.

An autopsy of the body of Foster resulted in findings that he had bled to death primarily from a stab wound at the neck which severed a main artery. He also had knife wounds on his arm and leg and shoulder. He was a young male person weighing between 180 and 190 pounds.

Collins testified at trial that she and Foster and the baby had gone to bed before eleven o'clock. After falling asleep she was awakened by loud noises of a commotion and screaming. Foster said "John, you mother fucker, you!" She then turned on the light and saw Foster fighting and struggling with appellant, John Smith. He was hitting Foster. She then ran out of the apartment and called to her mother.

At the outset appellant contends that the evidence serving to identify him as the person who inflicted the fatal wounds upon Foster was insufficient. In so doing appellant focuses on apparent weaknesses in the testimony of Collins. She testified that she did not see a knife and did not actually see appellant stab Foster. She may have testified that she recognized appellant before she turned the bedroom light on. On cross-examination she admitted to having consumed alcohol during the evening. She also admitted that she and Foster had had violent fights and that she had herself once stabbed him.

Standing against this evidence were the many facts and inferences including that on this night Foster and Collins were seen by Collins' mother already asleep in bed, and

were not engaged in an argument or fight. The physical evidence demonstrates a very violent and forceful attack. It is beyond question that Foster was stabbed repeatedly with a knife or cutting instrument. The jury may well have reasoned that Collins' failure to see the knife resulted from the fact that she was abruptly awakened from sleep and confronted with a violent struggle, in which life hung in the balance. Movements of hands and bodies would naturally be fast and random. In sum, the violent nature of the relationship between Collins and Foster and her possible impairment from ingestion of alcohol and the nature of her testimony were for the jury to weigh and evaluate under the circumstances in arriving at its decision whether to credit Collins' testimony that she recognized appellant as Foster's assailant on this occasion. The jury was presented with direct proof of identification presented by Collins, which was susceptible of belief, and was sufficient to warrant the jury in concluding to a moral certainty beyond a reasonable doubt that appellant attacked Foster with a knife as he lay asleep in his bed, and repeatedly stabbed him, thereby inflicting wounds upon him from which he quickly bled to death.

Relying upon these same evidentiary items, appellant contends that the evidence was insufficient to warrant the conclusion that appellant had the intent to kill in this assault. He also argues that the testimony of Collins was equivocal and therefore insufficient to convict. In *Gaddis v. State*, (1969) 253 Ind. 73, 251 N.E.2d 658, relied on by appellant, this Court reversed a conviction, deeming the identification evidence insufficient to convict. There, the lone eyewitness to the crime was unsure of his identification of the accused and defendant presented an alibi defense. Here Collins was completely unequivocal in her identification of appellant, and no alibi defense was presented. Appellant and Collins were very well acquainted as were their respective families. Her testimony was that appellant was hitting Foster and Foster was bleeding from the mouth and fell to the floor. The testimony of the pathologist showed that one wound to the neck pierced the throat and another a major artery in the neck and that appellant's lungs were found filled with blood. Based upon the same considerations as above, we conclude that the jury was warranted in concluding beyond a reasonable doubt from the stealth employed, and the repeated acts of stabbing, that appellant intended on this occasion to kill Foster.

## II.

■ The claim is made that the trial court erroneously permitted the prosecution to introduce three brown paper envelopes into evidence. They were sponsored by a police technician who testified that she took scrapings from three designated locations at the crime scene and placed them in these envelopes. She testified that they contained what was possibly blood. After they were admitted there was no further testimony regarding them or their contents. Evidence is relevant if it is material to an issue in the case and tends to make a desired inference more probable. *Musick v. State*, (1976) 265 Ind. 207, 352 N.E.2d 717; *Pirtle v. State*, (1975) 263 Ind. 16, 323 N.E.2d 634. These exhibits do not possess the evidentiary requirement of relevancy. The defense objection to their introduction was well taken. However, we find that their introduction posed no danger of creating unfair prejudice or misleading innuendo. No specific form which such prejudice may have taken has been presented. The only possible inference which may have been drawn from the envelopes is that there was blood in three locations in the apartment. This inference would not prejudice appellant's substantial rights, as there were photographs and many statements made throughout the trial, that the victim Foster bled profusely and that there was much blood on the baby, the bed, the floor, the wall, the sofa, the doorway, and rags used to help Foster. Of the fact that there was blood present throughout the apartment, there was not doubt. The admission of these envelopes was harmless.

### III.

Appellant unsuccessfully sought suppression of an oral confession allegedly made by him to police officers as he was being transported by them from Chicago to Indianapolis. He claims that the State failed to prove beyond a reasonable doubt that this confession was made voluntarily. Indeed such was the burden of the State. *Ortiz v. State*, (1976) 265 Ind. 549, 356 N.E.2d 1188. In order to satisfy this burden the State must prove to the satisfaction of the trier of fact that the decision to give the statement was the product of a rational intellect and a free will, and not induced by any violence, threats, promises, or other improper influences. *Nacoff v. State*, (1971) 256 Ind. 97, 267 N.E.2d 165.

Appellant was arrested in Harvey, Illinois, held there two days and transported to Cook County Jail in Chicago and held there an additional two days when he was picked up by officers from Indianapolis. During his detention in Illinois, he was interrogated concerning other possible crimes, and at some point was taken before a magistrate where he was advised of his rights and waived extradition to Indiana. While in the Cook County Jail, he was required to eat from a piece of cardboard, part of his clothes were taken from him, and he was unable to lie down. When picked up he was advised of his rights pursuant to the requirements of *Miranda v. Arizona*, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, with the exception that he was not told that if he chose to speak, he could stop talking at any point and have a lawyer present. On route from Chicago with the two officers, they encountered a severe snow storm, but though the roads had been closed they chose to continue on. During this hectic episode, appellant engaged in general conversation with the officers. He said that he was in a hurry to get back to Indianapolis, and was told by the officer driving that he too wanted to get back and that they would drive through. Appellant asked who the witnesses would be against him and was told, "the same witnesses as at the beginning." Appellant then said that he stabbed Foster. The officer who was dealing with the driving then told him to shut up, and that if he wanted to give a statement he would have to wait until they got back to Indianapolis.

From the foregoing, we conclude that appellant's statement that he stabbed Foster was not inadmissible as involuntary or as taken in violation of the requirements of *Miranda, supra*. It is elementary that the State is not required to prove that it gave an advisement of rights to a suspect unless it seeks to introduce the product of custodial interrogation.

> "Although Miranda's requirement of specific warnings creates a limited exception to the rule that the privilege must be claimed, the exception does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." *Roberts v. United States*, (1980) 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622.

Custody was surely present here. Appellant was isolated in the car with police officers when he made the admission of having stabbed Foster. However, there was no questioning by the officers and no conduct on their part designed to bring forth a self-incriminating response by appellant regarding events surrounding the killing of Foster. *Rhode Island v. Innis*, (1980) 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297. Consequently appellant's statement was not *Miranda* violative.

The claim is made that appellant's statement was inadmissible as involuntary. There is no question that appellant was subject to uncomfortable and frightening conditions in the Cook County Jail, or that he had been subject to interrogations by detectives from Harvey, Illinois. Appellant also supports this claim by pointing out that he was not brought before a magistrate on the Indiana charge of murder in Indiana until two days after notice of his arrest by Illinois police had reached Indianapolis. There is nothing in these experiences of appellant that would bring pressure to bear upon him to speak about events in Indianapolis. The Illinois custodial events were behind him and the delay from date of

receipt of notice by Indianapolis police to that point was approximately one day. Appellant was with Indiana police as he spoke and was on his way to Indianapolis. They would not be perceived by him as responsible for conditions of his prior detention. They testified that they did not threaten appellant or offer him any inducement to speak about the charge, or mistreat him in any manner.

Appellant also attempts to support this claim by pointing out that the State brought forth no evidence of appellant's low intelligence and mental capacity. They did however testify that he responded to them as though he knew what was happening and understood accurately the meaning of his prior waiver of extradition, the warrant for murder, and the purpose of his custody and transportation by the officers.

The evidence on this point was sufficient to warrant the trial court's conclusion beyond a reasonable doubt that appellant's decision to state that he had stabbed Foster was freely and voluntarily made, and was not the product of coercion or other improper influence. There was no constitutional error in permitting the introduction of the statement.

### IV.

■ In testimony one of the police officers who returned appellant to Indianapolis was permitted over an irrelevancy objection to explain his reasons for telling appellant to shut up, after appellant had said that he stabbed Foster. It is a general rule that a witness to or participant in a conversation may relate a previous relevant conversation or the substance thereof.

In answering, the officer stated:

"My reasons for telling him to shut up was due to the fact of having taken many statements pertaining to a defendant's statement, I always want to be sitting still where a person is in good condition. The best position for taking a statement is when a person is sitting down. I didn't want him to say anything while I was driving. I was worried about staying on the road; it was a bad night and I always

advise a person, his first right is to remain silent don't say anything 'cause right now when you're traveling, you're concerned about staying on the road and Sgt. McCoy and he were talking and I just told him to shut up and not talk about the case."

Appellant relies on the general rule that a witness may relate a previous conversation or the substance thereof, but must leave it to the trier of fact to determine the intent of the parties. *Elkhart & Western R.R. Co. v. Waldorf*, (1897) 17 Ind.App. 29, 46 N.E. 88. In the circumstances of this case, the limitation in this rule was not violated, as the witness had previously testified that as part of his statement to appellant to shut up, he had stated to appellant his reasons for it. The officer testified:

"Q. Okay, what did you overhear the defendant say?

A. He was saying to Sgt. McCoy that he had stabbed the subject and I—when he said this, that he had stabbed a man, I turned sideways and said 'Hey, I don't want you to talk about this; your first right is you got a right to remain silent, don't even talk about this case 'cause I want to wait until I get back to headquarters and then I can take a taped statement off of you.' And like I said, I told him to shut up."

No error occurred when the trial court overruled this objection.

### V.

■ The trial court sustained a prosecution relevancy objection to a defense exhibit which was apparently a photograph taken of appellant with the prosecution witness Collins. The photograph was taken on the occasion of a homecoming party given for appellant upon being released from the penitentiary one year before the attack upon Foster. The photograph would apparently have tended to prove a cordial relationship between appellant and Collins at the time. After the court sustained an objection for the second time to the photograph, it invit-

ed appellant to substantiate its relevance whereupon defense counsel expressly withdrew the exhibit. The decision to do so was undoubtedly predicated upon the fact that the jury had already heard a detailed description by the sponsoring witness of the meaning and content of the photograph, and other evidence also heard by the jury unmistakably chronicled the fact that appellant and Collins had been friends. When counsel did not attempt to support the relevancy of the exhibit on the occasion of its second unsuccessful attempt to introduce and withdrew it from the record, he acquiesced in the ruling of the court and there was no error in its exclusion. *Strickland v. State*, (1977) 265 Ind. 664, 359 N.E.2d 244; *Foust v. State*, (1927) 200 Ind. 76, 161 N.E. 371.

The conviction is affirmed.

GIVAN, C.J., and HUNTER, PRENTICE and PIVARNIK, JJ., concur.